# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.   A-2506-23
                         A-2507-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

T.T. and K.F.,[1]

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF MI.L.F.
and MA.R.F., minors.

_____

     Argued April 29, 2025 – Decided May 12, 2025

     Before Judges Firko and Augostini.

---

[1] We employ initials and pseudonyms to identify the parties, the children, and others to protect the children's privacy and because records relating to Division proceedings held pursuant to <u>Rule</u> 5:12 are excluded from public access under <u>Rule</u> 1:38-3(d)(12).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FG-01-0031-22.

Ryan T. Clark, Designated Counsel, argued the cause for appellant T.T. (Jennifer Nicole Sellitti, Public Defender, attorney; Ryan T. Clark, on the briefs).

Caitlin A. McLaughlin, Designated Counsel, argued the cause for appellant K.F. (Jennifer Nicole Sellitti, Public Defender, attorney; Caitlin A. McLaughlin, on the briefs).

Wesley Hanna, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Welsey Hanna, on the brief).

Damen J. Thiel, Designated Counsel, argued the cause for minors (Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Damen J. Thiel, on the brief).

PER CURIAM

Defendants T.T. (Teresa) and K.F. (Kyle) appeal from a judgment of guardianship terminating their parental rights to their biological daughters Mi.L.F. (Madison), born in January 2018, and Ma.R.F. (Melody), born in February 2019.[2] Judge Jorge Felipe Coombs convened the guardianship trial

---

[2] The parties also have a son (Kevin) who was born in February 2020 and is not a party to this appeal.

and rendered an oral opinion. Teresa and Kyle argue the Division of Child Protection and Permanency (Division) failed to establish by clear and convincing evidence the statutory four-prong best interests test under N.J.S.A. 30:4C-15.1(a).[3] Teresa also contends the judge erroneously terminated her parental rights by citing her limited trial attendance as a basis for terminating her parental rights in violation of her Fifth Amendment due process rights.

The Law Guardian seeks affirmance. We conclude, after reviewing the record in light of Teresa's and Kyle's arguments, that the judge correctly applied the governing legal principles, and sufficient credible evidence supports the judge's findings. Therefore, we affirm.

I.

We begin our discussion with the legal framework governing the termination of parental rights. Parents have a constitutionally protected right to the care, custody, and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). That right is not absolute. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527,

---

[3] On July 2, 2021, the Legislature enacted L. 2021, c. 154, deleting the last sentence of N.J.S.A. 30:4C-15.1(a)(2), which read "[s]uch harm may include evidence that separating the child from [their] resource family parents would cause serious and enduring emotional or psychological harm to the child."

3

553 (2014). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature established the standard for determining when parental rights must be terminated in a child's best interests. N.J.S.A. 30:4C-15.1(a) requires the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the [judge] has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

The four prongs are not "discrete and separate," but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "The considerations involved [in

4

determinations of parental fitness] are extremely fact sensitive and require particularized evidence that address[es] the specific circumstance[s] in the given case." R.G., 217 N.J. at 554 (internal quotation marks omitted) (second alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 280 (2007)).

II.

A. Family History

The pertinent facts and procedural history are fully recounted in Judge Coomb's comprehensive oral opinion and need only be summarized. The Division has been involved with Teresa's and Kyle's families prior to Madison's birth. In August 2011, Teresa was placed under the legal custody of her aunt (Tori) at the age of eleven. Because of Teresa's "out of control" behaviors, the Division remained involved with her. Ultimately, Tori contacted the Division to remove Teresa from her care. On July 28, 2017, the Division was granted custody of Teresa after learning she was pregnant, and Tori had applied to emancipate Teresa. In response, the Division placed Teresa in the Together Shelter. Approximately one week later, Teresa ran away from the Together Shelter to live with Kyle.

Several weeks later, Teresa was returned to Tori's custody, and the Division closed its case but continued to provide services. In January 2018, Teresa gave birth to Madison at a hospital. Three days after Madison was born, Tori was granted temporary custody of the newborn and was willing to welcome Teresa back into her home. In February 2018, Teresa regained custody of Madison and lived with Kyle afterwards at his mother's house.

On March 20, 2018, a Division worker responded to Kyle's mother's home after receiving a referral alleging drug use occurring at the home. After arriving at the home, the Division worker observed police breaking up a physical fight involving Kyle. Kyle's mother was hostile to the Division worker and refused to submit to a drug screen.

On April 11, 2018, a Division worker attempted to inspect the residence and discovered "deplorable conditions in the home . . . there was grime on everything in the home." On April 20, 2018, a Division worker responded again to Kyle's mother's home after receiving another referral alleging drug use by Teresa, Kyle, and Kyle's mother, but only Kyle's mother was home, and she would not let them inside. On April 26, 2018, Madison, Teresa, and Kyle agreed to participate in parenting services and drug screens and to have Madison stay with Kyle's cousin, S.G. (Sandy). On May 3, 2018, after Teresa and Kyle

6

refused to cooperate with the Division, and it was discovered Madison remained at Kyle's mother's house, Madison was removed from Teresa's and Kyle's custody.

On May 7, 2018, the Division filed a verified complaint for custody of Madison and care and supervision of Teresa.  Several weeks later, the Division filed an amended verified complaint to include Teresa as a defendant.  On June 1, 2018, the Division requested that Kyle and Teresa comply with the following: substance abuse evaluations, urine screens, psychological evaluations, domestic violence counseling, and attending classes at the Family Life Center (FLC). Further, Kyle was to complete a Fathers Ending Abuse program.

On July 24, 2018, after Kyle tested positive for marijuana, he was recommended for level one outpatient treatment.  On August 21, 2018, Kyle started attending outpatient treatment at Atlantic Prevention Services (APS). Teresa and Kyle were both referred to classes at FLC.  On September 7, 2018, Teresa and Kyle began parent-child integration visits at the FLC.

On September 17, 2018, a fact-finding hearing was held where a judgment was entered against Kyle pursuant to N.J.S.A. 30:4C-12, but not Teresa, as she was a minor at the time of the hearing.  On September 25, 2018, Teresa and Kyle

had a verbal argument at the FLC. Kyle admitted he acted inappropriately and was in need of anger management.

On October 4, 2018, Kyle was discharged from the APS outpatient treatment due to lack of attendance and failure to attend group sessions. On October 5, 2018, the FLC agreed to have Kyle and Teresa attend the program on different days after Teresa filed charges against him resulting from Kyle pushing Teresa on September 25, 2018 during an altercation.

On October 20, 2018, Kyle was referred to the Father's Ending Abuse program as a result of his behavior at the FLC. Several weeks later, it was reported that Kyle and his mother had a domestic violence incident resulting in the police responding to her home. On December 4, 2018, Kyle began attending services at Father's Ending Abuse. On December 6, 2018, a prior judge transferred legal and physical custody of Madison to Sandy pursuant to N.J.S.A. 9:6-8.55 and ordered supervised contact for Kyle's visits with Madison. Kyle and Teresa were not permitted to visit Madison at the same time.

On December 10, 2018, Teresa underwent a psychological evaluation with Larry Seidman, Ph.D. Dr. Seidman diagnosed Teresa with anxiety disorder, panic disorder, antisocial personality disorder, borderline personality, narcissistic personality, and being a victim of child neglect. Dr. Seidman

recommended Teresa treat with a psychiatrist and have supervised contact with Madison.

On December 13, 2018, Kyle attended a psychological evaluation with Dr. Seidman. Dr. Seidman diagnosed Kyle with an unspecified neurodevelopmental disorder, unspecified substance use disorder, paranoid personality disorder with narcissistic personality type, antisocial personality type, histrionic personality style, and spouse or partner violence. Dr. Seidman recommended random urine screens, weekly therapy, domestic violence training, and parent education classes. Dr. Seidman concluded that Kyle did not evidence freedom from drug dependence and acting-out behaviors to parent Madison without significant external support and supervision.

On January 3, 2019, the FLC reported that Teresa had completed six months in its program but made only minimal progress toward her "Individual Service Plan" goal and had not demonstrated the ability to consistently provide for her daughter. A few days later, FLC reported that Kyle had been on his cell phone multiple times during a visit and did not follow the staff's instructions. At another visit, Kyle was offended by the activity coordinator's recommendations and expressed his feelings in front of surrounding clients. Because of his behavior, Kyle was suspended from visits between January 11

and January 25, 2019. Kyle eventually completed the Father's Ending Abuse program.

In February 2019, Teresa gave birth to Melody at a hospital. On February 25, 2019, the Division conducted a Dodd[4] removal of Melody. On February 27, 2019, the Division filed a second amended verified complaint adding Melody to the complaint. Melody was placed in a nonrelative resource home after Sandy advised she could not care for her.

In July 2019, Melody was placed with Amy and Darren. That same month, Teresa and Kyle obtained an apartment together. Kyle was arrested for possession of marijuana. In August 2019, Teresa began FLC parenting training for a second time. During this time period, Kyle rarely attended visits at the Division office or saw Madison. On October 22, 2019, Teresa advised the Division that Kyle had moved out from their apartment, they were not going to reside together anymore due to his unwillingness to comply in getting things done, and that she wanted her children "back into her care." In December 2019, Teresa completed her FLC training.

---

[4] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82. The Dodd Act was authored by former Senate President Frank J. 'Pat' Dodd in 1974." N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

In January 2020, overnight visits began with Teresa, Madison and Melody. The Division noted, "around the beginning of the new year of 2020 . . . the parents had really made a lot of progress towards reunification." In January 2020, Teresa was visibly pregnant but continued to tell the Division that she was not pregnant. On January 22, 2020, Kyle and Teresa refused to return Madison to Sandy. In early February 2020, Teresa went missing from the Division and cancelled all visits with Madison and Melody for weeks.

In February 2020, Kevin was born in Philadelphia, Pennsylvania to Teresa and Kyle. Teresa and Kyle were ordered to produce Kevin by 5:00 p.m. on March 5, 2020, following an emergent hearing. For two months thereafter, they continued to deny Kevin's existence.

Throughout March and April 2020, Teresa and Kyle failed to virtually or physically visit with Madison and Melody during the COVID-19 pandemic. On May 12, 2020, Kyle admitted to Kevin's existence in court. Teresa was granted unsupervised visits with her daughters and was allowed to supervise Kyle's visits with them.

In September 2020, Dr. Edwardo Castillo completed psychiatric evaluations of Teresa and Kyle. Dr. Castillo described Kyle as having completed all of the Division's recommendations and opined he did not need any

further mental health interventions. Dr. Castillo described Teresa as having no need for any psychiatric medications but that she needed to continue her individual psychotherapy.

In late 2020, Teresa and Kyle underwent psychological evaluations with Dr. Gregory Gambone. Dr. Gambone recommended Teresa complete anger management training, individual psychotherapy, co-parenting counseling with Kyle, and opined she "should currently be considered only marginally capable of adequately parenting her children on an independent basis." As to Kyle, Dr. Gambone recommended he undergo a complete medication review and possible treatment for improved attention function, participate in a substance abuse evaluation and treatment, if necessary, complete anger management and engage in individual psychotherapy and family therapy with Teresa. Dr. Gambone "recommended that [Kyle] should not currently be considered capable of adequate parenting his children on an independent basis."

In November 2020, the Division was concerned that Kyle was secretly living with Teresa and Kevin as Teresa repeatedly prevented Division caseworker Lauren Holvick from accessing a room in her apartment. As of January 2021, Teresa was in counseling, but Kyle was discharged as non-compliant. On May 28, 2021, Madison told a Division worker that she saw Kyle

at Teresa's house without supervision and Teresa told Madison not to tell the Division. By June 2021, Teresa had been granted four hours of unsupervised time with Madison per week, however, Kyle's visits remained supervised due to his noncompliance with services.

In August 2021, Madison made a disclosure separately to Sandy and Holvick that "she had witnessed her dad hit her mom in the eye, causing her to have red stuff near her eye, you know, hinting at blood, and so that disclosure was made." Teresa, however, denied that Kyle had hit her and stated it was a result of a motor vehicle accident that occurred a month prior. Holvick observed that Teresa had "red blood—like a red in the white of her eye and I believe it was bruising near her eye."

On August 27, 2021, in a separate incident, Holvick observed an eye injury to Teresa who claimed she hit her face on a dresser or nightstand, and denied it was a result of domestic violence. Madison, however, stated that "she saw her dad punch her mom in the eye and said something like, don't go nowhere. Don't touch my phone." Teresa continued to deny that these incidents occurred, and her visits with Madison were no longer allowed to be unsupervised.

On January 25, 2022, Madison was removed from Sandy's custody due to an allegation of physical abuse by Sandy against Madison. Madison was placed with Melody in Amy and Darren's home. On February 8, 2022, Teresa admitted to Holvick the truth of Kyle's abuse and fled to a women's shelter in North Carolina. Teresa declined the Division's offer to go to a domestic violence shelter in New Jersey so she could stay close to her daughters. In addition, the Division offered Teresa the ability to visit Melody and Madison either virtually or by providing the transportation costs to have in-person visitation, but Teresa declined and did not participate in any visitation. The record indicates Teresa did not have any contact with Melody or Madison from February 2022 to September 2022.

B. The Guardianship Litigation

On June 30, 2022, the Division filed a verified complaint for guardianship of Melody and Madison. In August 2022, Teresa returned to New Jersey, but did not visit Melody or Madison. She temporarily resided at a domestic violence shelter in New Jersey with Kevin but left the shelter after a brief stay.

On September 1, 2022, the Division executed an emergency removal of Kevin from Teresa's and Kyle's custody, as they learned all three of them were living in a motel room Atlantic City in violation of a court order. During the

14

removal, Kyle became angry and had to be handcuffed until he was able to calm down. Kevin was placed in a non-relative resource home. In September 2022, Teresa was arrested and incarcerated for contempt of court.

Beginning in October 2022, Teresa started visiting Melody and Madison again at the FLC. Kyle also started visiting the children again around this time at the local Division office. When the visits started again, Melody began to wet herself while Madison repeatedly stated she did not want to visit Teresa or Kyle. On November 15, 2022, Madison appeared to be hyperventilating and only calmed down when she was informed she was not visiting Teresa or Kyle. In November 2022, Dr. Alan Lee conducted a psychological evaluation of Teresa and a bonding evaluation. Dr. Lee diagnosed Teresa with unspecified disruptive impulse control and conduct disorder, unspecified anxiety disorder, and post-traumatic stress disorder (PTSD).

The judge conducted the trial over thirteen non-consecutive days from April 26, 2023, to March 22, 2024. The Division presented Dr. Lee, Darren, and caseworkers Holvick and Brenda McBall as witnesses. Teresa and Kyle testified on their own behalf. The Law Guardian presented Dr. James Loving as a witness.

A-2506-23

Dr. Lee was qualified as an expert in clinical and forensic psychology. With regard to testing he administered to Teresa, Dr. Lee testified that she minimized personal problems, denied common shortcomings, and portrayed herself in "an almost unrealistically positive light." Dr. Lee explained that Teresa has a "pattern of inconsistent behavior" and "conduct," and is "irresponsible." Dr. Lee noted Teresa "has a heightened level of anger and resentment" that impacts her "basic presentation," and she struggles to "achieve and maintain stability" in her life.

Dr. Lee testified about his bonding evaluation with Teresa and each of the girls, which he conducted separately on November 21, 2022. He stated, "[w]hen I interviewed [Teresa] . . . specifically about [Madison] . . . about what [Teresa] believed [Madison's] relationship quality was like to [Teresa] and her initial response was, quote 'Don't know.'" Dr. Lee stated Teresa did not bring toys with her but utilized toys that the representative for the children came with, and "[t]here was no hug, there was no kiss" when Madison entered the room and the child's presentation was generally "neutral."

Dr. Lee found that Madison has "an ambivalent and insecure attachment and relationship" with Teresa. As to Madison, Dr. Lee concluded she did not have "a significant and positive psychological attachment and bond" to Teresa,

and there is a "low risk" of Madison suffering severe and enduring harm if her relationship with Teresa was permanently ended. Dr. Lee made similar findings regarding Teresa's relationship with Melody. Dr. Lee testified that Madison and Melody have formed significant and positive psychological attachments and bonds with their resource parents—Amy and Darren—and there was significant risk of enduring harm if the relationship between the resource parents and the children were ended.

Darren testified about the family's structure and that the children were doing "pretty well." Darren stated that he and Amy planned to adopt Madison and Melody and were not interested in legal guardianship or Kinship Legal Guardianship (KLG).

During Dr. Lee's second day of testimony, he opined that Teresa's "multiple issues" were unlikely "to be remediated within the foreseeable future." The record shows Kyle was present during this testimony, spoke out of turn, and cursed in court. Dr. Lee testified about Melody's special needs, developmental, speech, and chewing issues, and indicated Teresa did not believe Melody had these issues.

Holvick testified about the "deplorable" conditions at Kyle's mother's home when Teresa and Kyle had been living there with Madison, noting there

was grime, mold, bugs, and minimal food for the family. Holvick described there was an "odor of either mold or . . . rotten wood" within the home, the carpets had grime, there was a small space heater in the tiny room Madison was staying in, and holes in the walls indicative of "physical fighting."

Holvick testified about the Division's attempts to provide Teresa and Kyle with services and their lack of progress and cooperation. Holvick recounted Madison's domestic violence allegations of her dad punching her mom in the eye and how Madison felt "bad about it." After graduating from the FLC program in May 2024, Holvick testified that Teresa only visited Madison and Melody once or twice a month, and Kyle's visitation has been "very minimal." According to Holvick, Kyle went several months without visitation. Holvick testified about an incident at the Division's office between Kyle and his brother where there was "some aggression towards caseworkers," resulting in a safety protocol being implemented. Holvick expressed the Division's concern about Kyle's ability to parent while taking THC.

McBall testified about Kyle's visits with Madison and Melody. McBall went on to discuss that Madison is afraid of her father, and Melody was crying at one of his visits because she claimed he was "being mean" to McBall. Additionally, McBall testified that the girls do not want to see Kyle. After

listening to McBall's testimony, the judge suspended Kyle's visitation until the conclusion of the litigation. McBall testified Madison attends Children's Intensive and Emotional Behavioral Services at the Children's Hospital of Philadelphia and receives therapeutic counseling and services for her behavior while Melody is receiving Care Management Organization services.

With regard to domestic violence, Holvick was recalled to the stand and testified that Teresa denied the allegations and claimed she hit her face on a piece of furniture. Holvick stated Kyle denied there was any domestic violence between him and Teresa. Holvick discussed recent domestic violence concerns between Kyle and his new partner. Holvick testified that Teresa had moved to Georgia and was residing there but did not inform the Division about her move. Holvick testified that there were no relatives who could care for Madison and Melody. Holvick represented that both Teresa and Kyle had active arrest warrants in New Jersey.

Holvick testified Teresa would not show a budget or financial report to the Division, leading to issues concerning reunification and financial instability. As to Kyle, Holvick stated she saw three to five of his paystubs in the last two-and-a-half years.

Dr. Loving was qualified as an expert in clinical and forensic psychology. On March 9, 2023, he conducted a psychological evaluation of Teresa. Dr. Loving also conducted bonding evaluations of the girls with Teresa and of the girls with Amy and Darren. Dr. Loving stated that Kyle failed to appear at psychological and bonding evaluations.

Dr. Loving testified that Teresa admitted giving birth to Kevin in Philadelphia and hiding him from the Division for three months. Dr. Loving noted Teresa was "refreshingly candid" and "very forthcoming" about her trouble becoming a "more stable and more healthy" young adult. Regarding psychological tests he administered to Teresa. Dr. Loving testified the results were "invalid" because she answered them so defensively.

Dr. Loving diagnosed Teresa with major depressive disorder, unspecified anxiety disorder, cannabis use disorder, and PTSD. Dr. Loving opined that Teresa "is not safe for reunification" and "won't be for at least the foreseeable future." In Dr. Loving's opinion, Teresa had barriers to reunification identified as domestic violence risk, poor parenting judgment, housing instability, and cannabis use.

As to the bonding evaluation between the girls and the resource parents, Dr. Loving observed the girls "have a comfort level" and a "familiarity" with

Amy and Darren and a lot of "physical closeness." Dr. Loving concluded

Madison and Melody have "strong attachments" to their resource parents. Dr.

Loving acknowledged that both girls have attachments to Teresa. He stated that

Madison had a stronger attachment to Teresa as

> [Madison] has had a chance to build a stronger attachment with [Teresa] and by now, my opinion is that she has a fairly strong attachment.
>
> Unfortunately, it's also my opinion that that is an insecure attachment. She's had a lot of experiences with [Teresa] that have made it impossible for her to see her mother as reliable, as safe. She has reported domestic violence during a visit.
>
> Her mother has not shown for visits, significantly. And so this is an important attachment for [Madison]. It's fairly strong but it also has these emotionally painful qualities to them.
>
> Younger [Melody] also has an attachment to [Teresa]. It's more straightforward but it's also weaker. So as I see it, [Melody] has an attachment to her mother. It's fairly weak, but it also isn't complicated. She's younger. She's had fewer of those complicated experiences than her sister has.
>
> This just isn't a particularly strong attachment but it is an attachment and, like I said earlier, she and her sister are both capable of forming strong, healthy attachments under good circumstances. Just as of now, those circumstances have been limited.

21

A-2506-23

Further, Dr. Loving observed that although there might be short-term confusion for the girls if their relationship with Teresa was severed, it would not cause long-term emotional harm as Amy and Darren and other services provided would mitigate any harm.

In terms of Teresa's marijuana use, Dr. Loving stated "[s]he didn't see a problem with the extent of [m]arijuana use at all. She was just complying with that treatment because it was a requirement." Further, Dr. Loving:

> still [had] concerns about her insight, her ability to manage that, for example using the marijuana as a way of self-medicating. She was open to the therapy that she was attending, but we also talked about medication, which had . . . been recommended to her.
>
> And she was really resistant to taking any sort of antidepressant medication or anxiety medication, even if it might be helpful for her.

Teresa testified that she had misrepresented to the court that she was in the hospital on two days of the trial. In regards to a domestic violence incident with Kyle, she testified,

> Me and [Kyle] had gotten into a fight over a fan and some—during that right, the piece of—a piece of the fan ended up like splitting my eye.
>
> So in order for me to go to the hospital and make it not seem like I was in a [domestic violence] altercation, I told them that I was in a car accident.

22

A-2506-23

Teresa said she lied to the hospital because she did not want Kevin taken away. Teresa testified that Madison had never witnessed any domestic violence between herself and Kyle. Teresa further testified she was no longer in a relationship with Kyle and that historically, there was domestic violence in their relationship.

In regard to going to North Carolina, Teresa stated "I chose to leave New Jersey because I was . . . trying to get away from [Kyle]. I thought it was the best decision for me and my son at the time." Teresa said she was evicted from a shelter in North Carolina after she was caught "smoking weed" in her room. Teresa said she returned to live with Kyle in New Jersey in May 2022 but did not advise the Division under September 2022.

Teresa stated that as of September 2023, she had moved to her cousin's house in Georgia and remained there as of trial. She further testified that she had only seen Madison and Melody in person two times since moving to Georgia, was not having any virtual or telephone contact, was not engaging in any services in Georgia. She also testified she stopped attending her substance abuse treatment because she tested positive for cocaine but denied using it. Teresa admitted that at one point she was smoking marijuana five times a day, but she was barely smoking at all now.

23

Kyle testified that his relationship with Teresa involved domestic violence. Kyle admitted that he slapped Teresa, but said she had hit him also. In regard to Teresa's move to North Carolina, Kyle stated,

> She's very easily influenced. She's very gullible. Like, she's—you know, somebody has to be around her to keep her on the straight and narrow. . . . I just didn't trust her down there by herself, around other people that she didn't know, that my son didn't know.

Kyle further admitted he knew that the Division was trying to find Teresa and he assisted them in hiding. Further, Kyle acknowledged he declined to participate in the psychological and bonding evaluations because he felt it would not help his case. Finally, Kyle admitted he knew that he was violating court orders when he visited his children unsupervised.

### III.

Subsequent to the presentation of the evidence and closing arguments of counsel, the judge rendered an oral decision summarizing the matter's procedural history and making factual findings as to each of the required elements of the best-interests-of-the-child standard set forth in N.J.S.A. 30:4C-15.1(a). Based on those findings, the judge determined the Division sustained its burden of proving by clear and convincing evidence it was in Madison's and Melody's best interests to terminate Teresa's and Kyle's parental rights.

24

In his opinion, the judge found Dr. Lee's testimony persuasive that Teresa "was not a minimally adequate parent" based on her past behavior, and her "prognosis for change was poor." The judge credited Dr. Loving's testimony that Teresa was unable to minimally parent the children now or in the foreseeable future and was "supportive of adoption." The judge found the conditions that existed at the outset of the case "still existed on the whole presently" as to both Teresa and Kyle.

Prong One

The first prong of the best interests test requires the Division demonstrate that the "child's safety, health, or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1); see K.H.O., 161 N.J. at 352. The concern is not only with actual harm to the child but also the risk of harm. In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999) (citing N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 616 n.14 (1986)). The focus is not on a single or isolated event, but rather "on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348.

Our Court has explained a parent's withdrawal of nurture and care for an extended period is a harm that endangers the health of a child. D.M.H., 161 N.J.

at 379 (citing K.H.O., 161 N.J. at 352-54).  When children "languish in foster care" without a permanent home, their parents' "failure to provide a permanent home" may itself constitute harm.  Id. at 383 (second quotation citing N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 591-93 (App. Div. 1996)).  The judge need not wait until children are "irreparably impaired" by parental abuse or neglect.  D.M.H., 161 N.J. at 383.  "The State has a parens patriae responsibility to protect children from the probability of serious physical, emotional, or psychological harm resulting from the action or inaction of their parents."  N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 110 (App. Div. 2004).

Regarding the first prong, the judge highlighted that domestic violence was admitted by both Teresa and Kyle while the children were in the home, whether immediately present or not, and the children observed injuries after the fact.  The judge determined both parties have criminal histories, past and present housing instability, substance abuse—heavy use of marijuana—and financial instability.  The judge noted the testimony of the caseworkers and from Kyle that he is a "hard worker" and has maintained employment at various times.  In contrast, the judge found Teresa does not have the same level of financial

stability and "jumped between jobs." The judge found Teresa's and Kyle's financial instability led to their housing instability.

The judge found Teresa's and Kyle's "tension and mistrust" due to their experience with the Division as children led to their "running away, hiding, untruthfulness, and deception" creating issues between them and the Division and the children. Consequently, the judge emphasized this led to "inconsistent service compliance, significant and prolonged inconsistencies with visitation," and threats in the face of a lack of family support. The record supports the judge's determination under prong one.

Prong Two

Regarding prong two, which overlaps with prong one, the judge found Teresa and Kyle are either unwilling or unable to eliminate the harms facing the children. The judge noted Teresa's and Kyle's engagement in services has been "inconsistent or partial," "self-selective with regard[] to substance abuse evaluation and treatment," and "selective" in terms of "bonding evaluations and certain psychological evaluations." The judge pointed out that Teresa and Kyle admittedly testified about "being resistant to the Division's efforts to provide them with the necessary services and tools to overcome those harms." Given the failure to meet or eliminate these harms, or to provide a safe and stable home,

the judge found the delayed permanency "has only added to the harm to both children." There is substantial credible evidence in the record to support the judge's finding under prong two.

Prong Three

The third prong requires evidence that "[t]he [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the [judge] has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." M.M., 189 N.J. at 281 (internal quotation marks omitted) (citation omitted).

Under the first part of prong three, the judge found the Division made reasonable efforts to provide services to Teresa and Kyle by providing "numerous referrals" for both of them for substance abuse evaluation and treatment. The judge highlighted that the Division provided bonding and psychological evaluation opportunities for Teresa and Kyle, as well as coordinated transportation for visits and services. Additionally, the judge

determined the Division provided placement services for the children relative to their "emotional, behavioral, and educational needs," case management, and referrals to individual, domestic violence, and anger management therapies.

Under the second part of prong three, the judge found that the Division had explored, without success, alternatives to termination, and assessed numerous relatives and KLG, but all were eventually ruled out. The judge noted that the resource parents were advised about the differences between KLG and adoption "numerous times" by Division caseworkers. The record supports the judge's determination under prong three.

Prong Four

Finally, the judge concluded under prong four that the termination of Madison's and Melody's parental rights would not do more harm than good. The judge found the uncontroverted testimony of Dr. Lee and Dr. Loving demonstrated that Teresa and Kyle would not be able to parent in the reasonably foreseeable future. The judge highlighted that he was "moved" by Teresa's testimony but noted the children's circumstances "do not follow the same pattern as the placements for [Teresa]," which involved "abuse and instability." The judge found Dr. Lee and Dr. Loving were "reliable and credible," and they were

29

not "impeached" under cross-examination. A memorializing order was entered. This appeal followed.

IV.

Before us, Teresa and Kyle argue the Division failed to prove by clear and convincing evidence all four prongs of the best interests of the child test. Teresa also contends the judge erred in basing his decision, in part, on her limited attendance at trial and thus deprived her of due process. We are unpersuaded.

<u>Prong One</u>

Teresa and Kyle contend that the judge erred in finding that the Division satisfied the first prong of the "best interests" test by clear and convincing evidence. In particular, Teresa argues the judge's finding that she endangered the children's health and development was only due to her childhood Division involvement, poverty, and housing instability, which were not her fault. Further, Kyle argues the judge improperly found against him because there was no evidence that Kyle ever caused any harm to the children during a domestic confrontation. Kyle maintains that he addressed the domestic violence issue by attending an intensive program in 2018.

To satisfy the first prong, the Division must clearly and convincingly demonstrate harm "that threatens the child[ren]'s health and will likely have

<span style="float:right">A-2506-23</span>

deleterious effects on the child[ren]." K.H.O., 161 N.J. at 352. This harm need not be actual because "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." D.M.H., 161 N.J. at 383. Rather, courts consider whether the children's safety, health, or development will be endangered in the future. N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 440 (App. Div. 2001). As such, the prong may be satisfied by the mere risk of harm if supported by sufficient evidence. See D.M.H., 161 N.J. at 383; A.G., 344 N.J. Super. at 435-36.

Our Court has stressed harm includes the denial of "the attention and concern of a caring family" which it considers "the most precious of all resources." D.M.H., 161 N.J. at 379. "A parent's withdrawal of that solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of a child." Ibid. Such a withdrawal is not "inadequate parenting;" rather, it is a "failure to provide even minimal parenting." Ibid. at 379 (quoting A.W., 103 N.J. at 606-07). A parent's failure to provide a "permanent, safe, and stable home" engenders significant harm to the children. Id. at 383.

In the matter under review, the judge appropriately concluded Madison's and Melody's safety, health or development have been or will continue to be

endangered by a parent relationship with Teresa and Kyle. Pertinently, the judge found "both of these children have required different services to assist in their development, their behaviors and their education" and that "those pose a danger" to their safety, health, and "specifically development." The judge observed there was "very little assistance" from Teresa and Kyle over the last several years, and there are "many remaining obstacles" confronting them. The judge reasoned that he had continued concerns about "domestic violence, anger management, housing instability, as well as substance abuse," and Teresa's and Kyle's ability to "cope and adequate[ly] parent while on substances" together with a lack of steady visitation and commitment towards completing services. The judge also highlighted the lack of "steady employment and stability, most specifically for [Teresa]" and lack of "reliable housing" for both parents in analyzing prong one.

Moreover, the record supports the judge's determination that Teresa ignores the fact that both children have different services related to their behavior and development and that Melody has special needs. The record also clearly establishes that Kyle harmed Madison and Melody through his patterns of behavior of domestic violence towards Teresa while the children were present in the home, his marijuana abuse, housing instability, inconsistent service compliance, his need for supervised visitation, and lack of consistent visitation.

32

The judge's decision under prong one is amply supported by the credible evidence in the record.

Prong Two

Teresa argues the judge erred because the evidence does not show she is unwilling or unable to become fit but instead demonstrates her substantial progress and compliance with many required services. Kyle contends the judge erred under prong two because he made "drastic and genuine changes in order to ensure a safe reunion with his children." Kyle also avers it is undisputed that he was willing to eliminate the conditions that caused the Division to remove the children. The Division and Law Guardian counter that Teresa and Kyle are not only unable but also unwilling to provide a safe, stable, and permanent home for Madison and Melody.

The second prong of the best interest determination, "in many ways, addresses considerations touched on in prong one." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 451 (2012). Evidence supporting the first prong may also support the second prong "as part of the comprehensive basis for determining the best interests of the child[ren]." D.M.H., 161 N.J. at 379. This prong "relates to parental unfitness," K.H.O., 161 N.J. at 352, and "the inquiry

centers on whether the parent is able to remove the danger facing the child." F.M., 211 N.J. at 451.

The Division can satisfy this inquiry by showing the parent or parents cannot provide a safe and stable home and that the child or children will suffer substantially from a lack of stability and permanent placement. M.M., 189 N.J. at 281. Because the Legislature placed "limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child[ren]," "[t]he emphasis has shifted from protracted efforts for reunification with . . . birth parent[s] to an expeditious, permanent placement to promote the child[ren]'s well-being." C.S., 367 N.J. Super. at 111 (citing N.J.S.A. 30:4C-11.1; D.M.H., 161 N.J. at 385; K.H.O., 161 N.J. at 357-59).

Here, the judge concluded the second prong was satisfied. The judge determined the record clearly established Teresa and Kyle were "unable, at this time, to eliminate the harm now or in a foreseeable future." Moreover, the judge aptly found the experts were "credible" and found Teresa testified she "worsened the circumstances by not complying" with the Division. Although Teresa made some improvement through the years, the record supports the judge's conclusion it was insufficient toward familial stability due to her inconsistent treatment and lack of compliance with the Division's requirements. Therefore, the judge

34                                                                    A-2506-23

properly found under prong two that Teresa will not rehabilitate herself to a degree necessary to cure the harm she caused Madison and Melody.

Under prong two, the judge also correctly found that Kyle was unwilling or unable to eliminate the harms facing Madison and Melody. Kyle's argument is belied by the expert testimony and the judge's finding that Kyle was "self-selective" about substance abuse evaluation and treatment and selective with regard to bonding evaluations, certain psychological evaluations requested, and not attending therapies on an ongoing basis. The judge's determination under prong two as to Teresa and Kyle was based upon substantial credible evidence in the record.

Prong Three

Teresa and Kyle contend the judge erred in concluding that the Division exercised reasonable efforts to provide services to help them to correct the circumstances that led to placement outside the home. Teresa argues the Division failed to show by clear and convincing evidence that it provided reasonable services with the goal toward reunification and failed to adequately support her, particularly given her status as a former foster child who suffered "serious trauma," indicative of a "broader systemic issue." In addition, Teresa

asserts the Division's actions "were inconsistent with its moral and legal obligations to support her as a matter of law."

In a similar vein, Kyle argues the Division failed to show by clear and convincing evidence that it provided reasonable services with the goal toward reunification and failed to make reasonable efforts to support him with correcting the circumstances that led to the children's removal. Kyle also contends the Division failed to provide adequate assistance to him to ensure he obtained housing for himself and the children.

KLG allows a relative to become the child's legal guardian and commit to care for the child until adulthood, without terminating parental rights. N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 508 (2004). The Legislature created this arrangement because it found "that an increasing number of children who cannot safely reside with their parents are in the care of a relative or a family friend who does not wish to adopt the child or children." N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 222-23 (2010).

Prior to July 2, 2021, KLG was considered "a more permanent option than foster care when adoption '[was] neither feasible nor likely.'" P.P., 180 N.J. at 512 (emphasis added) (quoting N.J.S.A. 3B:12A-6(d)(3) to (4)). As such, "when a caregiver . . . unequivocally assert[ed] a desire to adopt," the standard to

impose a KLG was not satisfied because the party seeking a KLG arrangement would not be able to show that adoption was neither feasible nor likely. N.J. Div. of Youth & Fam. Servs. v. T.I., 423 N.J. Super. 127, 130 (App. Div. 2011). In other words, when permanency through adoption was available to a child, KLG could not be used as a defense to the termination of parental rights. N.J. Div. of Youth & Fam. Servs. v. D.H., 398 N.J. Super. 333, 341 (App. Div. 2008).

On July 2, 2021, however, the Legislature amended N.J.S.A. 3B:12A-6(d)(3) and removed the statutory requirement that adoption be "neither feasible nor likely" ("2021 amendments"), making KLG an equally available permanency plan for children in the Division's custody. However, the Legislature did not delete paragraph (d)(4) of the KLG statute, which requires a court to find "awarding [KLG] is in the child's best interests," N.J.S.A. 3B:12A-6(d)(4), before it can order KLG. Thus, the amended KLG statute simply ensures a resource parent's willingness to adopt and no longer forecloses KLG. But the amendment to N.J.S.A. 3B:12A-6(d)(3) does not affect the trial court's application of the best interests test for parental termination cases as codified under N.J.S.A. 30:4C-15.1(a)(1) to (4).

Substantial credible evidence in this record supports the judge's findings that the Division thoroughly explored alternatives to termination of parental

rights. N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008). See N.J. Div. of Child Prot. & Permanency v. D.C.A., 474 N.J. Super. 11, 27-28 (App. Div. 2022). The children's best interests are the polestar of any termination decision. D.H., 398 N.J. Super. at 338.

The third prong of the best interests test requires evidence that "[t]he [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the [judge] has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." M.M., 189 N.J. at 281 (internal quotation marks omitted).

"An evaluation of the efforts undertaken by [the Division] to reunite a particular family must be done on an individualized basis." D.M.H., 161 N.J. at 390. The evaluating court must also consider "the parent's active participation in the reunification effort." Ibid. In any situation, "[t]he services provided to meet the child's need for permanency and the parent's right to reunification must be 'coordinated' and must have a 'realistic potential' to succeed." N.J. Div. of

Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012) (quoting N.J. Div. of Youth & Fam. Servs. v. J.Y., 352 N.J. Super. 245, 267 n.10 (App. Div. 2002)).

This requires the Division to "encourage, foster and maintain the parent-child bond, promote and assist in visitation, inform the parent of the child's progress in foster care and inform the parent of the appropriate measures [they] should pursue . . . to . . . strengthen their relationship." R.G., 217 N.J. at 557 (alterations in original) (quoting D.M.H., 161 N.J. at 390). What constitutes reasonable efforts varies with the circumstances of each case. D.M.H., 161 N.J. at 390-91.

Here, the record is clear that the Division did not ignore Teresa and Kyle and expended reasonable efforts to work with them. With regard to Teresa, the Division made efforts to provide her with services and referrals for psychological evaluations, visitation, parenting classes, therapy, and transportation in its ongoing efforts at reunification. Contrary to Teresa's assertions, the Division provided her with multiple services, such as therapy, drug treatment programs, anger management, and rental assistance over the course of many years to address the issues that prevented her from caring for her children.

As to Kyle, the judge credited the Division's efforts to provide him with services and referrals for psychological evaluations, visitation, parenting classes, therapy, and transportation in its ongoing reunification efforts. Even when the Division allowed Teresa to supervise Kyle, he twice assaulted Teresa in front of Madison and engaged in domestic violence against Teresa when Kevin was present. Further, Kyle had a full-time job and stable housing, thus he did not need or request housing assistance.

We are satisfied the judge's finding that Amy and Darren were advised about KLG, but preferred adoption, is supported by the substantial credible evidence in the record. The 2021 amendments do not make KLG a bar to termination of parental rights followed by adoption because the court must still apply the best interests factors. Moreover, a caregiver must petition a court for a KLG appointment under N.J.S.A. 3B:12A-5(a), which was not done here.

The record shows Amy and Darren clearly rejected KLG because they wanted to give Madison and Melody a permanent and stable home. In sum, it is clear that the judge's determination rested on Madison's and Melody's best interests. Under the second part of prong three, the judge appropriately considered and determined that the record contained unrebutted evidence that

the Division initially attempted to place Madison and Melody with relatives, but none proved to be permanent.

In the matter under review, the Division clearly investigated KLG alternative options, but the record demonstrates no family members were interested or qualified. It is also undisputed that Madison and Melody are in the care of the resource parents. Thus, under prong three, the judge correctly concluded no KLG opportunities existed.

Prong Four

We are also satisfied with the judge's finding that the termination of Teresa's and Kyle's parental rights under prong four "will not do more harm than good," N.J.S.A. 30:4C-15.1(a)(4), as it is supported by substantial credible evidence. N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363, 368 (App. Div. 2015). The judge acknowledged under prong four, after balancing and considering the relationships between the children and the natural parents and caregivers, the children will suffer a greater harm from the termination of ties with the foster parents.

Here, the judge stressed that Dr. Lee testified that Madison and Melody did not share a strong bond with Teresa and would "not experience significant or prolonged harm from the termination." Moreover, the judge gave great

weight to Dr. Lee's testimony the "stability and consistency" provided by the foster parents would mitigate the harms associated with the children's loss of contact and relationship with Teresa. The judge also noted Dr. Lee found a bond existed between Teresa and the children but did not "feel there were strong bonds" in analyzing termination of Teresa's parental rights. The judge emphasized the real parental relationship that exists between the children and the foster parents.

As to Kyle, the judge considered the expert testimony presented by the Division. Kyle did not undergo a psychological or bonding evaluation with the children. The judge reasoned, "unfortunately the [c]ourt can only work with the evidence that it's been presented" and noted Dr. Lee and Dr. Loving both opined that neither Teresa nor Kyle are "on track for reunification." The judge added, "neither [parent] showed a plan, a clear plan in the foreseeable future even with the engagement of services and therapy, that would provide for the appropriate permanency for the children within a reasonable time."

It was well within the judge's discretion to afford significant weight to Dr. Lee's and Dr. Loving's testimony. The Division's proofs showed the children are in a loving, caring, pre-adoptive home, and Teresa and Kyle are unable to provide the necessary safe and stable home and emotional support the children

need.  See N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 93 (App. Div. 2013); see also Cnty. of Middlesex v. Clearwater Vill., Inc., 163 N.J. Super. 166, 173-74 (App. Div. 1978).

We are also satisfied by the judge's finding of Madison's and Melody's need for permanency and stability, and his determination that Teresa and Kyle would not be able to provide either in the foreseeable future.  Moreover, Teresa and Kyle did not present a viable plan to make the changes necessary to provide Madison and Melody with the loving, safe, and stable home they need and deserve.

V.

Finally, Teresa argues she was deprived of due process because the judge based his decision, in part, to terminate her parental rights because she "did not attend every moment of trial."  Teresa contends her limited attendance at trial fails to account for "the critical context of her situation," and her move to Georgia to escape "a dangerous domestic violence scenario" to secure a safer environment for herself and her children to be reunified.  Again, we are unpersuaded.

It is well-established that an individual invoking the Fifth Amendment "privilege against self-incrimination may do so 'in any . . . proceeding, civil or

criminal, . . . where the answers might tend to incriminate him [or her] in future criminal proceedings.'" State v. P.Z., 152 N.J. 86, 101 (1997) (first alteration in original) (quoting Minn. v. Murphy, 465 U.S. 420, 426 (1984)). "When a party in a civil matter asserts the privilege against self-incrimination, the fact-finder may draw an adverse inference of guilt." N.J. Div. of Child Prot. & Permanency v. S.K., 456 N.J. Super. 245, 266 (App. Div. 2018) (citing Attor v. Attor, 384 N.J. Super. 154, 165-66 (App. Div. 2006)); see also State, Dep't of Law & Pub. Safety v. Merlino, 216 N.J. Super. 579, 587-88 (App. Div. 1987) (holding a court may draw an adverse inference where a party refuses to testify in a civil matter).

Despite Teresa's assertions to the contrary, the record shows the only time the judge commented on Teresa's trial attendance was when he "observed a pattern of drowsiness in [Teresa], lateness, inconsistency, even during the proceedings themselves." The judge noted that when appearing remotely, Teresa often logged in "after the fact, leaving early." Contrary to Teresa's assertion, the judge did not invoke an adverse inference regarding her trial attendance but referred to her substance abuse. Indeed, Teresa was unable to come to court on June 13 and 14, 2023, and was allowed to participate by phone.

Therefore, we conclude Teresa's Fifth Amendment and due process rights were not violated.

At bottom, we are satisfied the judge correctly determined the Division presented clear and convincing evidence establishing all four prongs of the best interests of the child standard under N.J.S.A. 30:4C-15.1(a). To the extent we have not specifically addressed any of Teresa's and Kyle's arguments, we conclude they are of insufficient merit to warrant extended discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

45